EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Carlos Weber Carrillo | |
| --- | --- |
| Peticionarios | Certiorari |
| v. | 2014 TSPR 46 |
| Estado Libre Asociado de Puerto Rico | 190 DPR ____ |
| Recurridos | |

Número del Caso: CC-2010-588

Fecha: 24 de marzo de 2014

Tribunal de Apelaciones, Región Judicial de San Juan

Abogados de la Parte Peticionaria:

      Lcdo. Frank Torres Viada
      Lcdo. Gaspar Martínez Mangual

Oficina de la Procuradora General:

      Lcda. Margarita Mercado Echegaray
      Procuradora General

      Lcda. Amir Cristina Nieves Villegas
      Procuradora General Auxiliar

Materia: Derecho Constitucional – Derecho a la intimidad: expectativa de intimidad sobre registro de llamadas telefónicas.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Carlos Weber Carrillo
    Peticionario

                                    *Certiorari*

        v.

                            CC-2010-588

Estado Libre Asociado de Puerto
Rico y otros
            Recurridos


Opinión del Tribunal emitida por la Jueza Asociada señora Fiol Matta


En San Juan, Puerto Rico, a 24 de marzo de 2014.

Hoy resolvemos que el Estado no puede obtener los registros de llamadas telefónicas de un ciudadano sin antes notificarle de ello u obtener una orden judicial a esos efectos, aunque la persona cuyos registros se soliciten no sea objeto de la investigación gubernamental. En otras palabras, reconocemos que una persona tiene una expectativa razonable de intimidad sobre los registros de sus llamadas telefónicas, particularmente cuando esta información está en manos de un tercero. Por último, atendemos cómo esta normativa interactúa con una acción en

daños y perjuicios presentada por la persona afectada por la intrusión gubernamental.

I

El 22 de octubre de 2003, el periodista Carlos Weber Carrillo se enteró de que, dos meses antes, el Negociado de Investigaciones Especiales del Departamento de Justicia (NIE) le había requerido a su compañía de teléfono una relación de todas las llamadas que él hizo y recibió desde su celular en febrero de 2003. La información había sido entregada sin que al señor Weber se le notificara y sin que mediara una orden judicial.

Al indagar sobre la intervención con su historial de llamadas, el señor Weber supo que la investigación se debía a que, el 12 de febrero de 2003 y como parte de sus funciones como reportero, él había inquirido sobre un operativo del NIE que no se había anunciado a la prensa.[1] Esto provocó que el director del Negociado le encomendara al fiscal Francisco Viera Tirado que investigara si alguno de los agentes del NIE estaba filtrando información sin autorización.

---

[1] El señor Weber recibió una llamada anónima en la cual le informaron sobre un operativo en un negocio de DVDs, por lo que llegó al lugar con un equipo de televisión poco tiempo después de que el operativo concluyera y luego llamó a la Oficina de Prensa del Departamento de Justicia para solicitar más información. Al día siguiente, se celebraría una conferencia de prensa sobre los resultados del operativo, la cual fue cancelada.

El fiscal Viera emitió una orden *subpoena duces tecum* para que la compañía Cingular produjera las listas de las llamadas realizadas por los agentes del NIE que participaron del operativo desde sus teléfonos <u>oficiales</u>. Al examinarlas, encontró que uno de los inspectores había hecho tres llamadas a un número telefónico ajeno a los de la agencia, tres horas antes del operativo y mientras este se llevaba a cabo. Por ello, requirió a Cingular, mediante otra orden *subpoena*, que le proporcionara el <u>nombre</u> y la información personal del usuario de ese número de teléfono, <u>así como una relación de todas las llamadas realizadas y recibidas por ese teléfono en el mes de febrero</u>. Cingular produjo la información solicitada. El usuario del número resultó ser el señor Weber. Cuando el señor Weber preguntó en el NIE si era cierto que habían inspeccionado sus datos personales, el fiscal Viera le indicó que sí, pero que no se preocupara pues la investigación no era en su contra, sino para detectar violaciones a las normas del NIE por parte de los agentes.[2]

El señor Weber demandó al Estado por violación a sus derechos civiles, violación de su derecho a la intimidad y por daños y perjuicios. Alegó que, sin notificarle previamente ni contar con una orden judicial, el NIE

[2] Divulgar información sobre las operaciones del NIE sin autorización constituye un delito grave. 3 L.P.R.A. 1381 (derogada); artículo 82(a) del Plan de Reorganización Núm. 4 de 2011, 3 L.P.R.A. Ap. XXI Ap. 82(a).

requirió a Cingular el estado mensual de las llamadas de su celular, que incluye tanto las comunicaciones con todo tipo de ciudadanos para cobertura periodística como sus comunicaciones personales.[3] El reportero expresó en su demanda que esa intervención, ilegal y negligente, se hizo con grave menosprecio a su seguridad, su tranquilidad y su expectativa de intimidad, y que, luego de que advino en conocimiento de la situación, sus reclamos se trataron con total indiferencia.[4] Señaló que la indagación en su información sin su consentimiento y sin que él hubiera cometido infracción alguna es inconstitucional y le causó angustias mentales, por lo que solicitó una indemnización de $650,000.[5]

---

[3] Aunque el teléfono es asignado y pagado por el patrono del señor Weber, el reportero tiene derecho a utilizarlo tanto para gestiones profesionales como personales. Es decir, es su teléfono celular. Incluso, en el registro de llamadas obtenido por el NIE aparece como nombre de usuario del móvil el del señor Weber y no el de Univisión. Apéndice del *certiorari*, págs. 881-895.

[4] Demanda, 25 de agosto de 2004; Apéndice del *certiorari*, págs. 650-655.

[5] El informe pericial del psiquiatra que evaluó al señor Weber indica que sufrió de un síndrome de angustia postraumática, caracterizado por sensaciones de ansiedad, temor, ira e hipervigilancia, que se intensifican al no saber si situaciones similares de invasión a su privacidad se podrían estar repitiendo y al combinarse con sus recuerdos como víctima de la persecución del Estado durante el gobierno militar del dictador Augusto Pinochet en Chile. El psiquiatra concluyó que la profundidad e intensidad de estos estados anímicos alterados se evidenciaba por su presencia aún después de casi dos años desde que el señor Weber descubriera la actuación del Estado; Apéndice del *certiorari*, págs. 872-877.

Luego de diversos trámites procesales y de la celebración del juicio, el Tribunal de Primera Instancia dictó Sentencia en la cual desestimó la reclamación del señor Weber.[6] Concluyó que al demandante no se le violó su derecho a la intimidad respecto a su celular, debido a que el señor Weber no tenía expectativa de privacidad sobre éste, pues quien recibe la factura es su patrono y él siguió utilizando el mismo número telefónico después de enterarse de la orden *subpoena*. Sin embargo, el tribunal de instancia reconoció que en Puerto Rico no está decidido si un individuo tiene expectativa de intimidad sobre su registro de llamadas en posesión de su proveedor de telefonía. La Sentencia indicó también que la acción del fiscal Viera estaba amparada en ley, pues tenía el propósito de detectar qué agente estaba violando la disposición legal que impone una pena criminal por divulgar información del NIE sin autorización, y que ésta no conllevó indagar sobre el contenido de las llamadas. Asimismo, el foro de instancia determinó que no se logró probar que existiera un nexo causal entre algún daño real del señor Weber y las actuaciones del NIE.

Inconforme con el resultado, el señor Weber solicitó revisión ante el Tribunal de Apelaciones. El foro apelativo

---

[6] Sentencia del Tribunal de Primera Instancia; Apéndice del *certiorari*, págs. 554-574.

confirmó al de instancia.[7] Expuso que el Estado no utilizó la orden *subpoena* deliberadamente para no tener que cumplir con las normas de notificar a la persona cuyos documentos se investigan y de obtener una orden judicial, y que llegó a la información del reportero mediante una cadena investigativa válida y razonable. Enfatizó en que la evidencia no sería utilizada contra el señor Weber en un procedimiento administrativo o judicial. Además, le brindó deferencia al foro de instancia en cuanto a que no se presentó prueba certera sobre los daños sufridos por el demandante a causa de las acciones del Estado.

El señor Weber recurrió ante este Tribunal. Expedimos el recurso y recibimos los alegatos de ambas partes. El peticionario señaló que el foro apelativo erró al determinar que la obtención de información personal del señor Weber no constituyó un registro, que el criterio de razonabilidad era suficiente para validar el requerimiento de información y que la agencia no tenía que cumplir con los controles de notificación previa u orden judicial. Además, indicó que el tribunal erró al resolver que el peticionario no albergaba expectativa de intimidad sobre su registro de llamadas y que no sufrió daños resarcibles. Argumentó que, tanto por el entendido social de protección a la privacidad de las comunicaciones personales, como por

---

[7] Sentencia del Tribunal de Apelaciones, 30 de marzo de 2010, Apéndice del *certiorari*, págs. 17-36.

la obligación legal que tienen las compañías de telefonía de salvaguardar la información de sus usuarios y los patrones de uso de sus equipos, los ciudadanos tienen una expectativa de intimidad razonable sobre información como la obtenida por el NIE sobre el historial del celular del señor Weber.[8] Añadió que no había razón para presumir que hubiera renunciado a sus derechos por el mero hecho de hacer lo que cualquier persona haría: utilizar los servicios de una compañía de telefonía que registra las llamadas para comunicarse, beneficiarse del pago de su celular por parte de su patrono y usar su teléfono móvil para ejercer su función como periodista. Asimismo, puntualizó que el requerimiento ni siquiera se centró en los registros pertinentes a la fecha del operativo, sino que se estudiaron sus llamadas de todo el mes. También discutió la prueba pericial sobre los daños sufridos por el señor Weber, la cual no fue impugnada o rebatida.

Por su parte, el Estado alegó que el señor Weber no tenía una expectativa razonable de intimidad sobre sus registros de llamadas que conllevara el deber del NIE de notificarle antes de solicitar la información a la compañía de telefonía u obtener una orden judicial para ello. Enfatizó en que el Tribunal Supremo de Estados Unidos

---

[8] Se refiere a las disposiciones sobre protección de la privacidad de los usuarios y de la información sobre su utilización de los servicios en la Ley de Telecomunicaciones federal de 1996, según enmendada, 47 U.S.C.S. sec. 222.

decidió en 1979 que no existe tal expectativa pues, al marcar números de teléfono, los usuarios proveen voluntariamente esa información a la empresa que gestiona sus llamadas y consienten a que ésta sea conservada para propósitos de facturación.[9] Advirtió que el requisito de notificación u orden judicial se ha exigido en casos como el de las planillas de contribución sobre ingresos y los estados de cuentas bancarias en los que la información requerida tiene "contenido", es decir, que revelan información íntima sobre la persona, mientras que la lista de números a los que se ha llamado no divulga propiamente el contenido de las comunicaciones. También subrayó que el fiscal Viera hizo la solicitud como parte de una investigación legítima. Indicó que, si hubo invasión a la intimidad del señor Weber, esta fue mínima y cede ante el interés del Estado de determinar si hubo una divulgación indebida de información confidencial del NIE.[10] Asimismo,

---

[9] Discute el caso de <u>Smith v. Maryland</u>, 442 U.S. 735 (1979), que abordaremos próximamente en esta Opinión.

[10] Por otro lado, el Estado explicó que los pleitos por daños contra el Estado por acciones culposas o negligentes, realizadas por un funcionario en su capacidad oficial y dentro del marco de sus funciones, no proceden cuando se basan en actos ocurridos al desempeñar una función discrecional, como la de los fiscales de procesar criminalmente a un ciudadano, aun cuando haya abuso de discreción. Añadió que, de proceder la causa de acción, la compensación máxima sería de $75,000. Alude a los artículos 2 y 6(a) de la Ley de Reclamaciones y Demandas contra el Estado, 32 L.P.R.A. secs. 3077 y 3081. No discutiremos el primer planteamiento pues, como señala el propio Alegato del Estado, el fiscal que requirió la información no estaba ejerciendo su discreción de procesar criminalmente a un

señaló que el peticionario no probó adecuadamente sus angustias mentales y que el tribunal de instancia no estaba obligado a aceptar la declaración del perito psiquiatra. Por tanto, solicitó que se confirmara la Sentencia del Tribunal de Apelaciones, que avaló la desestimación de la demanda por el foro de instancia.

## II

El derecho a la intimidad goza de la más alta jerarquía en nuestro ordenamiento constitucional y aplica *ex proprio vigore*.[11] La Constitución de Puerto Rico protege a las personas contra ataques abusivos a su vida personal y prohíbe los registros, allanamientos e incautaciones irrazonables sobre la persona, la casa, los papeles y los efectos de los ciudadanos y las ciudadanas.[12] Asimismo, la Constitución de Estados Unidos establece la prohibición contra registros y allanamientos irrazonables como protección básica y como lo mínimo que deben garantizar los

---

ciudadano respecto al señor Weber. Además, la discreción de los fiscales es limitada, pues al investigar no se pueden violar los derechos constitucionales de los ciudadanos, como veremos más adelante. Tampoco atenderemos el ~~segundo~~ planteamiento sobre la compensación máxima bajo la Ley de Reclamaciones y Demandas contra el Estado, pues referiremos la determinación sobre los daños al foro de instancia.

[11] López Tristani v. Maldonado, 168 D.P.R. 838, 849-850 (2006); Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35, 64 (1986).

[12] Const. P.R., Art. II, secs. 8 y 10. Nuestra Constitución también prohíbe interceptar las comunicaciones telefónicas.

estados y territorios.[13] Por eso, en nuestro país existen diversas garantías para salvaguardar la información personal.

La intromisión del Estado en la vida privada de un individuo, cuando ésta es necesaria para llevar a cabo una investigación criminal, no está prohibida, pero está limitada, pues el interés gubernamental de poner en vigor las leyes penales y combatir el crimen no permite violar los derechos de los ciudadanos y las ciudadanas a su intimidad.[14] Una agencia puede emitir una orden *subpoena* para obtener documentos en manos de terceras personas para adelantar una investigación administrativa o criminal, siempre que con ello no infrinja los derechos de los investigados. De igual forma, puede requerir información perteneciente a terceros en quienes no se ha centrado la investigación, pero cuando dicho requerimiento se le hace a un tercero, resulta imperante la protección judicial ante la intervención gubernamental.

En el presente caso, la información está en manos de un tercero, en el sentido de que no es a Cingular a quien se refieren los documentos solicitados. Además, la

---

[13] Const. E.U.A., Enm. IV.

[14] Pueblo v. Santiago Feliciano, 139 D.P.R. 361, 385-386 (1995). Esta protección, que limita la intervención gubernamental, es fundamental porque el derecho a la intimidad garantiza la soberanía del individuo sobre su mente y su espacio inmediato, y evita un efecto disuasivo sobre la libertad de expresión, que es esencial en una sociedad democrática. *Íd.* pág. 395. *Véase también* E.L.A. v. Coca Cola Bott. Co., 115 D.P.R. 197, 205-209 (1984).

información le pertenece a un tercero, en el aspecto de que la investigación sobre la posible comisión de un delito no estaba dirigida a acusar al señor Weber. Por ello, surge la necesidad imperante de proteger la intimidad del ciudadano que no es sospechoso ante la posibilidad de que el tercero que posee información suya la divulgue a la agencia de gobierno que se la solicite.

### A

En nuestro ordenamiento jurídico, se le ha reconocido al Estado amplia autoridad investigativa con el fin de atender y resolver los problemas que enfrenta nuestra sociedad y asegurar que la política pública vigente en diversas áreas de la vida social se implante adecuadamente.[15] Es decir, aunque es común que las agencias obtengan información de manera voluntaria, con frecuencia se les delega mediante legislación el poder de obligar a las personas a que suministren la información que las agencias necesiten.

Entre los diversos poderes delegados a las agencias administrativas está el poder de citación, que se utiliza para obtener información en el curso de una investigación. Estas citaciones "son instrumentos vitales para que las agencias puedan cumplir las funciones que se les

---

[15] *Véase* H.M.C.A. (P.R.), Inc., Etc. v. Contralor, 133 D.P.R. 945, 959 (1993).

encomendaron".[16] El poder de requerir información de manera coercitiva incluye el poder de citar testigos y el de requerir la producción de documentos.[17] En particular, muchas agencias tienen facultad para utilizar dos instrumentos investigativos fundamentales. El primero es el *subpoena ad testificandum*, mediante el cual se requiere el testimonio de alguna persona; el segundo es el *subpoena duces tecum*, que ordena a la persona comparecer ante la agencia para producir documentos. Sin estas herramientas, el poder de investigación administrativo quedaría restringido a la información obtenida con el consentimiento del investigado.[18]

Ahora bien, aun aquellas agencias que poseen un poder investigativo amplio, incluyendo la facultad de requerir la producción de documentos mediante un *subpoena duces tecum*, no quedan, en el ejercicio de tal autoridad, "al margen de los postulados constitucionales que informan nuestro ordenamiento".[19] Esto, pues en determinadas circunstancias un requerimiento de esta naturaleza puede constituir un registro sujeto a los controles que emanan de la

---

[16] *Íd.*, pág. 968.

[17] *Íd.,* págs. 968-969.

[18] B. Schwartz, *Administrative Law*, 3ra ed., Boston-Toronto. Ed. Little, Brown and Co., 1991, pág. 125.

[19] H.M.C.A. (P.R.), Inc., Etc. v. Contralor*, supra*, pág. 969; RDT Const. Corp. v. Contralor I, 141 D.P.R. 424, 433 (1996).

Constitución, en particular, de la sección 10 del artículo II que protege contra los ataques abusivos y los registros, incautaciones y allanamientos irrazonables y la sección 8 del mismo artículo que garantiza la intimidad individual.[20] Esta garantía constitucional está diseñada para proteger la intimidad y dignidad de los seres humanos, amparar sus documentos y otras pertenencias, e interponer la figura de un juez o jueza entre los ciudadanos y los funcionarios de las ramas ejecutiva y legislativa para asegurar la razonabilidad en la intervención con la intimidad del individuo.[21]

La protección constitucional no opera automáticamente.[22] Por el contrario, se activa cuando la persona afectada tiene una expectativa razonable de intimidad sobre el lugar o los artículos registrados.[23] Se trata de un estándar que proviene de la norma federal anunciada en *Katz v. United States*,[24] en cuanto a la definición sustantiva de lo que constituye una expectativa razonable de intimidad. No obstante, debemos analizarla a

---

[20] *Pueblo v. Loubriel, Suazo*, 158 D.P.R. 371, 379 (2003). Ambas protecciones constitucionales están íntimamente relacionadas. *Acarón et al. v. D.R.N.A.*, 186 D.P.R. 564, 575 (2012); *Rullán v. Fas Alzamora*, 166 D.P.R. 742, 770-771 (2006).

[21] *Rullán v. Fas Alzamora*, *supra*, pág. 772.

[22] *Íd.*

[23] *Pueblo v. Loubriel, Suazo*, *supra*, pág. 379.

[24] 389 U.S. 347 (1969).

la luz de nuestra Constitución, pues, como explica el Juez Asociado Rivera Pérez en *Rullán v. Fas Alzamora*, "[e]n Puerto Rico, el derecho a la intimidad tiene un alcance más amplio que en el sistema federal de Estados Unidos".[25] Esta expresión se refuerza con lo que resolvimos recientemente en *Acarón et al. v. D.R.N.A* a los efectos de que "[e]n nuestro ordenamiento jurídico, esta protección constitucional se considera un valor comunitario de indiscutible jerarquía y, según hemos hilvanado jurisprudencialmente, consagra varios propósitos fundamentales".[26]

En vista de lo anterior, el criterio rector para evaluar si se ha violado el derecho consagrado en la Cuarta Enmienda de la Constitución de los Estados Unidos o en las secciones 8 y 10 del artículo II de la Constitución de Puerto Rico es "si la persona afectada alberga una expectativa de intimidad sobre el lugar o el artículo a ser registrado y si tal expectativa es razonable a la luz de los criterios prevalecientes en la sociedad".[27] La protección constitucional que opera cuando la persona afectada espera razonablemente que se respete su intimidad es fundamental pues el poder inquisitivo de las agencias administrativas puede, en ocasiones, convertirse en un

---

[25] *Rullán v. Fas Alzamora*, *supra*, pág. 771.

[26] *Acarón et al. v. D.R.N.A.*, *supra*, pág. 573.

[27] *RDT Const. Corp. v. Contralor I*, *supra*, pág. 436.

instrumento de hostigamiento y persecución. Por último, vale señalar que esta protección constitucional está presente tanto en procesos de naturaleza penal como en los de índole administrativa aunque, como veremos, el estándar para dirimir la razonabilidad del requerimiento no es el mismo y también dependerá del método investigativo utilizado.[28]

El análisis requerido para determinar si existe una expectativa razonable de intimidad que active la protección constitucional contra los registros y allanamientos irrazonables tiene, por consiguiente, dos etapas. La primera conlleva un análisis subjetivo que permite concluir si "el reclamante, según las circunstancias del caso, alberga una expectativa real de que su intimidad se respete".[29] Si esa expectativa existe, se procederá a la segunda etapa, en la que se realiza un análisis objetivo para determinar "si la sociedad considera razonable tal expectativa".[30] Según los estudiosos, la segunda etapa es la decisiva.[31]

---

[28] H.M.C.A. (P.R.), Inc., Etc. v. Contralor, *supra*, pág. 969; E.L.A. v. Coca Cola Bott. Co., *supra*, págs. 205, 207 y 212.

[29] López Tristani v. Maldonado, *supra*, pág. 852.

[30] *Íd.*

[31] Ernesto L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, V. I, Colombia, 1991, pág. 345, citando la Opinión Concurrente del Juez Harlan en Katz v. U.S., 389 U.S. 347 (1967).

Una vez se determina que existe una expectativa razonable de intimidad, la agencia que exija la producción de documentos utilizando su poder de *subpoena duces tecum* tendrá que informar de ello a la persona afectada u obtener una orden judicial a esos efectos.[32] En cuanto la notificación, hemos resuelto que esta "debe ser emitida con razonable anticipación y contener lo siguiente: información específica y detallada que exprese la razón, el propósito y la pertinencia de la solicitud, a la luz de la investigación que se esté llevando a cabo y la disposición legal que faculta a la [entidad gubernamental] en cuestión para realizar tal requerimiento".[33] El propósito de la notificación es permitir que la persona afectada cuestione el requerimiento ante el foro judicial.

Ya sea porque la agencia solicitó una orden judicial en primera instancia o porque la persona afectada decidió retar el requerimiento notificado, el tribunal analizará la razonabilidad del requerimiento a la luz de los criterios siguientes: (1) si la investigación está dentro de la autoridad conferida por ley a la agencia; (2) si el requerimiento no es demasiado indefinido; y (3) si la información solicitada es razonablemente pertinente al

---

[32] Rullán v. Fas Alzamora, *supra*, pág. 773; RDT Const. Corp. v. Contralor II, *supra*, pág. 864.

[33] Rullán v. Fas Alzamora, *supra*, pág. 778.

asunto específico bajo investigación.[34] Si bien le corresponde inicialmente a la propia agencia determinar la pertinencia de la información requerida, en caso de existir controversia sobre ello será el foro judicial el que hará la determinación final.[35] Este estándar de pertinencia razonable es menos estricto que el de causa probable utilizado en el ámbito penal; ahora bien, hemos advertido que según los procesos administrativos se asemejen más a los de carácter penal, "más se acercarán los dos géneros de registros".[36] Por eso, si el objetivo primario de un registro administrativo es obtener prueba para un proceso penal, la agencia deberá cumplir con los requisitos exigibles en los procesos de índole criminal. Ahora bien, un registro que se lleva a cabo durante una inspección civil *bona fide* no necesariamente se invalidará porque la prueba descubierta sea utilizable en un proceso penal.[37]

Además de distinguir entre los registros puramente administrativos y aquellos que tienen un contenido penal, nuestro ordenamiento diferencia entre los requerimientos

---

[34] RDT Const. Corp. v. Contralor I, *supra*, pág. 433; E.L.A. v. Coca Cola Bott. Co., *supra*, págs. 208-209. En ese sentido, un requerimiento excesivamente amplio o impertinente al asunto bajo investigación sería irrazonable.

[35] H.M.C.A. (P.R.), Inc., Etc. v. Contralor, *supra*, pág. 970; Comisionado de Seguros v. Bradley, 98 D.P.R. 21 (1968).

[36] E.L.A. v. Coca Cola Bott. Co., *supra*, pág. 213.

[37] *Íd.*

para la producción de documentos y el registro físico de la persona o el lugar.[38] Es decir, la razonabilidad de la actuación de la agencia dependerá del método investigativo utilizado.[39] Por tanto, en vez de utilizar una regla mecánica, "[l]a naturaleza, alcance y onerosidad de la intervención gubernamental son elementos más realistas a sopesar".[40]

En resumen, el análisis judicial dependerá de si se trata de un requerimiento o una incautación tras un registro o de una investigación puramente administrativa o una que tiene visos de naturaleza penal. Mientras más se aleje el proceso de una investigación criminal y menos intrusiva sea la actuación de la agencia, será más apropiado utilizar el criterio de pertinencia razonable en vez del de causa probable. Por el contrario, mientras más se aleje la investigación de fines puramente civiles y más se asemeje a una investigación criminal, aumentará la necesidad de cumplir estrictamente las salvaguardas constitucionales.

Cuando la persona agraviada es quien tiene la información requerida, el requerimiento a esta constituye suficiente notificación. Es cuando la información está en

---

[38] *Véase* H.M.C.A. (P.R.), Inc., Etc. v. Contralor, *supra*, pág. 967.

[39] RDT Const. Corp. v. Contralor I*, supra*, pág. 433.

[40] *E.L.A. v. Coca Cola Bott. Co., supra*, pág. 215.

manos de un tercero y es de tal naturaleza que la persona afectada tiene sobre ella una expectativa razonable de intimidad, que el requisito de notificación adquiere una importancia sustancial. En ese caso, hemos resuelto que la agencia tiene la obligación de notificarle a la persona afectada que se ha hecho el requerimiento al tercero, como garantía constitucional de la protección en contra de registros y allanamientos irrazonables.[41] Es una realidad de la vida contemporánea que la mayor parte de los *subpoenas* emitidos para obtener documentación se dirigen a terceros que no son las personas investigadas.[42] En esas circunstancias hemos exigido protecciones adicionales a las desarrolladas en la doctrina tradicional sobre requerimientos de información.[43] Cuando la persona que tiene la información es un tercero que no es objeto de la investigación, la protección judicial ante la intervención gubernamental se torna imperante.

_____

[41] Pueblo v. Loubriel, Suazo*, supra*, pág. 377. "[E]n aquellos casos en que instituciones gubernamentales tengan el poder para compeler a personas a suministrar información sobre la cual terceros pueden abrigar un derecho a la intimidad [estas] tienen, necesariamente, que notificar al agraviado o, en la alternativa, exigir los documentos a través de una orden judicial". *Íd.,* pág. 380.

[42] W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 1era Ed., Ed West., Suppl. 2007, sec. 4.13 citando, a su vez, a Slobogin, *Subpoenas and Privacy*, 54 DePaul L. Rev. 805 (2005).

[43] Véase H.M.C.A. (P.R.), Inc., Etc. v. Contralor, *supra;* RDT Const. Corp. v. Contralor I*, supra;* Rullán v. Fas Alzamora*, supra*.

Por último, cabe señalar que la condición de "tercero" en posesión de información no solo sucede cuando la información que este posee se refiere a una persona <u>que es el objeto de la investigación realizada por la agencia</u>.[44] Lo importante es que la persona cuya información se solicita albergue la expectativa razonable de intimidad sobre la misma.  Por eso, estas solicitudes también requieren que se notifique a la persona cuya información se solicita.

                                III

¿Hay una expectativa razonable de intimidad sobre los registros de llamadas telefónicas? El Estado plantea que no y señala, como su argumento principal, la decisión del Tribunal Supremo de los Estados Unidos en *Smith v. Maryland*. [45] En ese caso, el alto foro federal resolvió que no existe una expectativa razonable de intimidad sobre los números discados por una persona.[46] Sin embargo, a poco que analicemos detenidamente esa decisión a la luz de las críticas de estudiosos norteamericanos y puertorriqueños, así como de tribunales supremos estatales y nuestra propia jurisprudencia, nos damos cuenta que se requiere una contestación distinta a la que el Estado nos propone.

En *Smith v. Maryland*, el máximo foro federal, mediante votación dividida, resolvió que la instalación y

---

[44] *Véase* <u>Comisionado de Seguros v. Bradley</u>, *supra*.

[45] 442 U.S. 735 (1979).

[46] *Íd.*

utilización de un aparato llamado *pen register*, para identificar y guardar los números marcados desde un teléfono, no violaba la protección contra registros y allanamientos irrazonables de la Cuarta Enmienda de la Constitución federal. El Tribunal razonó que el mecanismo no registraba el contenido de las conversaciones y las personas no tenían expectativa de intimidad sobre los números discados puesto que accedían a que la compañía de teléfono los anotara para propósitos de facturación. En ese caso, el aparato fue instalado por la compañía telefónica, a petición de la Policía, con el fin de atrapar a un hombre que había asaltado a la dueña del teléfono que se intervino y que la continuaba acosando a través de llamadas amenazantes y obscenas.

La decisión del Tribunal se basó principalmente en *United States v. Miller*.[47] En ese caso, el Tribunal Supremo de los Estados Unidos resolvió que no había una expectativa razonable de intimidad sobre las transacciones bancarias, dado que los individuos proveían voluntariamente información financiera a los bancos para el manejo de sus cuentas y de esa forma asumían el riesgo de que estos revelaran esa información al Estado si este lo solicitaba. Es decir, la decisión en *Smith v. Maryland* es una consecuencia directa de lo resuelto en *Miller*.

---

[47] 425 U.S. 435 (1976).

En *RDT Const. Corp. v. Contralor I*, consideramos la misma interrogante atendida por el Tribunal Supremo federal en *Miller*. En aquella ocasión, el Estado solicitó un *subpoena duces tecum* para que un banco le entregara copia de las cuentas bancarias de una empresa investigada por uso indebido de fondos públicos. El Estado no solicitó una orden judicial ni notificó a la empresa investigada, alegando que, según lo resuelto en *Miller*, la entidad investigada no tenía una expectativa razonable de intimidad sobre sus transacciones bancarias.

Ante los argumentos del Estado, hicimos un análisis cuidadoso de la decisión federal. En particular, advertimos que la doctrina estadounidense había criticado fuertemente esa decisión, señalando su inconsistencia con *Katz*.[48] Además, resaltamos que el propio Congreso de los Estados Unidos reaccionó desfavorablemente a esta decisión al aprobar el *Right to Financial Privacy Act*.[49] Por último, hicimos hincapié en los muchos tribunales supremos estatales que rechazaron la doctrina anunciada en *Miller* al amparo de sus respectivas constituciones estatales.[50]

---

[48] La principal fuente de crítica a esta decisión provino del reconocido tratadista LaFave. *RDT Const. Corp. v. Contralor I, supra*, pág. 437, citando a LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed. Minnesota, Ed. West Publishing Co., sec. 2.7(c), págs. 511-512.

[49] 12 U.S.C. secs. 3401-3422, *Íd.* n. 3.

[50] *RDT Const. Corp. v. Contralor I, supra*, págs. 438-439.

De igual manera, evaluamos la situación planteada en el marco de la Constitución de Puerto Rico. En nuestro análisis, afirmamos la importancia que tienen las transacciones bancarias en la vida cotidiana de las personas y lo que estas revelan sobre los patrones, estilos de vida y situación económica de los clientes que utilizan los servicios de una institución bancaria. Recalcamos que esta información permite deducir a qué se dedica la persona, los lugares que frecuenta, los bienes que adquiere, el partido al que contribuye, los periódicos y revistas que lee, la iglesia a la cual hace donaciones, las asociaciones a las cuales pertenece, las tiendas y establecimientos donde compra, los médicos que visita y otra información de naturaleza íntima.[51] Al final, coincidimos con el profesor Chiesa Aponte en que es "difícil armonizar [*Miller*] con *Katz*"[52] y resolvimos que existe una expectativa razonable de intimidad sobre las transacciones bancarias. Rechazamos la doctrina de *Miller* y adoptamos la posición de varios tribunales supremos estatales, el tratadista LaFave, el profesor Chiesa Aponte y el Congreso de los Estados Unidos. Más importante aún,

---

[51] *Íd.,* pág. 441.

[52] Chiesa Aponte, *Derecho Procesal Penal, Op. cit.,* pág. 496. En <u>RDT Const. Corp. v. Contralor I</u>, *supra*, pág. 443, citamos con aprobación las expresiones del profesor sobre la expectativa razonable que tienen las personas de que los bancos mantendrán confidenciales los registros correspondientes a las transacciones bancarias.

llegamos a una conclusión acorde a la definición de intimidad contenida en nuestra Constitución.

En vista de lo anterior, para determinar si existe una expectativa razonable de intimidad sobre los registros telefónicos, el punto de partida no es *United States v. Miller* ni *Smith v. Maryland*. Por el contrario, basamos nuestro análisis en la doctrina adoptada en *RDT Const. Corp. v. Contralor I* y los casos subsiguientes que la aplican.[53]

En *Rullán v. Fas Alzamora*, analizamos un requerimiento legislativo para la producción de unas planillas de contribuciones sobre ingresos. En esa ocasión, resolvimos que la persona investigada tenía una expectativa razonable de intimidad sobre dichas planillas, pues de estas se podía obtener el mismo tipo de información que quisimos proteger en *RDT Const. Corp. v. Contralor I*.[54] En *Pueblo v. Loubriel,*

---

[53] Cabe mencionar que la controversia atendida por el Tribunal Supremo federal en Smith v. Maryland se asemeja más a nuestra decisión en P.R. Tel. Co. v. Martínez, 114 D.P.R. 328 (1983), en la que validamos una intercepción del propio teléfono, solicitada por una persona que alegadamente recibía llamadas amenazantes. Véase discusión en el texto más adelante.

[54] Además, expresamos que nuestra decisión en RDT Const. Corp. v. Contralor I, *supra¸* partía de la premisa de que "en conformidad con la protección que la Constitución de [Puerto Rico] provee a los ciudadanos contra intervenciones irrazonables del Estado, ni las empresas ni los individuos tienen por qué presumir que al proveer información a los bancos están renunciando a su expectativa de intimidad sobre ella". Rullán v. Fas Alzamora*, supra*, pág. 773. Es decir, rechazamos la lógica utilizada en *Miller* –y posteriormente en *Smith*– en cuanto al efecto de permitirle

*Suazo*, el Departamento de Hacienda llevó a cabo una investigación sobre el paradero de varios cheques que dicha agencia había emitido basados en información falsificada. Como parte de la investigación, Hacienda le requirió a una institución financiera información sobre las cuentas bancarias a las que finalmente fueron a parar sus cheques, en particular, los <u>nombres de los dueños de las cuentas</u>, hojas de depósito, tarjetas de firmas, así como <u>todas las transacciones relacionadas con las cuentas bancarias en donde se habían depositado esos cheques</u>.[55] <u>En esa etapa</u>, la investigación no se había centrado sobre ninguna persona en particular y simplemente se intentaba dar con el paradero de los cheques del Estado.[56] Al resolver, hicimos énfasis en el "derecho que tiene toda persona a conocer el paradero de sus cheques cuando éstos no son cobrados por sus debidos destinatarios".[57] En ese contexto particular resolvimos que no era necesaria la notificación previa para obtener <u>los nombres de los titulares de las cuentas bancarias</u>. Ahora bien, requerimos la notificación previa o la obtención de una orden judicial para tener acceso a información sobre

_____

a la institución financiera –o la compañía de teléfono– acceso a nuestras transacciones bancarias o telefónicas.

[55] <u>Pueblo v. Loubriel, Suazo</u>, *supra*, pág. 376.

[56] "La información requerida no se refería a las cuentas de individuos particulares, sino que se refería a las cuentas en donde los cheques emitidos por Hacienda habían sido depositados". *Íd.*, pág. 382.

[57] *Íd.*

las transacciones relacionadas con las cuentas bancarias identificadas. El derecho a la intimidad, explicamos, "se extiende a toda aquella información suministrada por los individuos a las instituciones bancarias que revelen los patrones, los estilos de vida o la situación económica de éstos. Esto incluye las transacciones bancarias de las personas".[58]

En cuanto a información relacionada a llamadas telefónicas, en *E.L.A. v. P.R. Tel. Co.,*[59] una decisión anterior a *RDT Const. Corp. v. Contralor I*, examinamos la pertinencia de cierta información a una investigación sobre uso ilegal de teléfonos que llevaba a cabo la Oficina de Asuntos Monopolísticos del Departamento de Justicia de Puerto Rico. Esa oficina le requirió a la Puerto Rico Telephone Company (P.R.T.C.), con relación a ciertos teléfonos, información sobre: (1) nombre del abonado, (2) su dirección actual, (3) la fecha de instalación y, (4) si el número no estaba en servicio, el nombre del usuario anterior y la fecha en que se dio de baja. La P.R.T.C. suplió la información requerida sobre aquellos usuarios cuyos nombres y direcciones constaban en el directorio telefónico, mas se negó a suministrar la información sobre los números no publicados. El ELA demandó a la P.R.T.C. para obtener la información denegada. Como se trataba de

---

[58] *Íd.* (Énfasis suplido).

[59] 114 D.P.R. 394 (1983).

una investigación sobre el uso de ciertos números telefónicos en posible violación a las leyes anti-monopolísticas, resolvimos que el requerimiento era pertinente a la investigación, que estaba debidamente autorizada por ley y que la petición era lo suficientemente definida.[60] Aunque hicimos referencia en nuestra opinión al "choque entre el interés del Estado en obtener acceso a información pertinente a una investigación y derecho de los individuos a su intimidad",[61] no resolvimos expresamente si estos tenían una expectativa razonable de intimidad sobre la información requerida.[62] No obstante, analizamos la razonabilidad del requerimiento a la luz de los tres (3) criterios aplicables a los registros gubernamentales en los que un individuo tiene una expectativa razonable de intimidad.

Otra decisión sobre este tema la emitimos en *P.R. Tel. Co. v. Martínez*.[63] En aquella ocasión, una persona solicitó una orden dirigida a la compañía telefónica para que interceptara su teléfono y determinara la procedencia de

---

[60] En particular, hicimos referencia a "la clara necesidad de acceso a información estrictamente limitada, como la que se requiere aquí, para el cumplido ejercicio del poder investigativo del Estado bajo la autoridad concedida por mandato expreso de ley". E.L.A. P.R. Tel. Co., *supra*, pág. 404. (Énfasis suplido).

[61] *Íd.,* pág. 401. (Énfasis suplido).

[62] Recordemos que en ese caso el Estado no solicitó el registro de llamadas, sino información tendente a identificar los titulares de los números investigados.

[63] 114 D.P.R. 328 (1983).

las llamadas amenazantes que estaba recibiendo e identificara el autor o autores de dichas llamadas. Ante la negativa de la compañía telefónica resolvimos que no se trataba de una investigación puramente criminal dirigida contra una persona, sino de una reivindicación del derecho a la intimidad de la persona que recibía las llamadas amenazantes.[64] Por tanto, validamos la intercepción.

En su alegato, el Estado hace referencia a una decisión de un tribunal supremo estatal adoptando la posición asumida por el máximo foro federal en *Smith v. Maryland*.[65] No obstante, al analizar las demás jurisdicciones de los Estados Unidos, como hicimos en *RDT Const. Corp. v. Contralor I*, notamos que muchos tribunales supremos estatales han rechazado contundentemente la norma de *Smith v. Maryland*.[66] Lo que es más, algunos de estos tribunales han resuelto que su rechazo a *Smith* es producto

---

[64] Íd., págs. 340-341.

[65] El ELA cita a State v. Johnson, 131 P.3d 173 (Oregon 2006) y una decisión de un tribunal apelativo de Florida. Otros estados no mencionados en el alegato del ELA han copiado la norma federal. *Véase,* State v. Valenzuela, 536 A.2d 1252 (New Hampshire, 1987).

[66] Entre estos, véase: Commonwealth v. Melilli, 555 A.2d 1254 (Pennsylvania, 1989); State v. Rothman, 779 P.2d 1 (Hawaii, 1989); Richardson v. State, 865 S.W.2d 944 (Texas, 1997); People v. Sporleder, 666 P.2d 135 (Colorado, 1983); State v. Hunt, 450 A.2d 952 (Nueva Jersey, 1982); State v. Gunwall, 720 P.2d 808 (Washington, 1986); State v. Thompson, 760 P.2d 1162 (Idaho, 1988). Véase, además, LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., 1987, sec. 2.7(b), pág. 507.

de su rechazo anterior a la norma de *Miller*.[67] Estas decisiones reconocen que el teléfono se ha convertido en una herramienta esencial para llevar a cabo nuestros asuntos personales y rechazan el que al suministrar información sobre llamadas realizadas para propósitos de facturación, los clientes de las compañías telefónicas dejen de tener una expectativa razonable de intimidad frente a los requerimientos del Estado.[68] Estos tribunales estatales han expresado de manera inequívoca su rechazo a *Smith* y han resuelto que, al amparo de sus respectivas constituciones, existe una expectativa razonable de intimidad sobre los registros de llamadas telefónicas.

Por último, el Estado sostiene que no hay una expectativa razonable de intimidad sobre el registro de llamadas realizadas porque, a diferencia de las planillas o de las transacciones bancarias, el registro no revela el contenido de las llamadas. Nuevamente, ese criterio ha sido rechazado en varias jurisdicciones cuyos tribunales han resuelto, acertadamente, que, al igual que las transacciones bancarias, la lista de números contenidas en una factura de teléfonos permite al Estado descubrir, con relativa facilidad, información privada de las personas,[69]

---

[67] Charnes v. Digiacomo, 612 P.2d. 1117 (Colorado, 1980).

[68] State v. Hunt, *supra*, págs. 955-956; People v. Sporleder, *supra*, pág. 141; Richardson v. State, *supra*, pág. 950.

[69] Véase, por ejemplo, Commonwealth v. Melilli, *supra;* People v. Sporleder, *supra;* State v. Hunt, *supra*.

incluyendo, por inferencia, el contenido de la conversación.

Por vía de los registros de llamadas se puede conseguir la misma información que a través de las transacciones bancarias, entiéndase, los lugares que la persona frecuenta, los bienes que adquiere, el partido al que contribuye, los periódicos y revistas que lee, la iglesia a la cual hace donaciones, las asociaciones a las cuales pertenece, las tiendas y establecimientos donde compra, los médicos que visita y otra información de naturaleza íntima. Todo ello nos lleva a concluir que, al amparo de nuestra Constitución, una persona tiene una expectativa razonable de intimidad sobre el registro de llamadas que realiza desde su teléfono. Tal conclusión es el resultado directo de nuestras decisiones en *RDT Const. Corp. v. Contralor I* (en cuanto a las transacciones bancarias) y *Rullán v. Fas Alzamora* (en cuanto a las planillas de contribuciones sobre ingreso).

Nuestro rechazo a la doctrina de *Miller* requiere un rechazo similar a la de *Smith*. Resulta evidente que el registro de llamadas telefónicas permite al Estado adquirir el tipo de información que quisimos proteger en *RDT Cont. Corp. v. Contralor I* y *Rullán v. Fas Alzamora.* Lo hablado durante una conversación telefónica no es la única fuente de información relacionada al contenido de nuestras llamadas. A quién llamamos, cuándo los llamamos, con qué

frecuencia los llamamos y por cuánto tiempo hablamos con ellos equivale, sin duda, a contenido. No nos cabe duda que hay una expectativa subjetiva de intimidad sobre el registro de las llamadas que hace una persona y que la sociedad entiende que tal expectativa es razonable. En ese sentido, como anticipamos en *RDT Const. Corp. v. Contralor I*, adoptamos la propuesta del profesor Chiesa Aponte: "Ciertamente hay una expectativa razonable <u>que la **compañía de teléfonos**</u> y el banco mantengan confidencial los <u>**récords correspondientes a las llamadas telefónicas**</u> y las transacciones bancarias".[70]

IV

En el caso de autos, el Negociado de Investigaciones Especiales del Departamento de Justicia tenía motivos fundados para pensar que alguno de sus agentes había filtrado información a la prensa relacionada a un operativo de la agencia. Recordemos que tal conducta podría ser constitutiva de delito.[71] Utilizando sus amplios poderes investigativos,[72] la agencia emitió una orden *subpoena duces tecum* para que Cingular produjera las listas de las

---

[70] Chiesa Aponte, *Derecho Procesal Penal*, *Op. cit.*, pág. 496. (Énfasis suplido)

[71] 3 L.P.R.A. 1381; 3 L.P.R.A. Ap. XXI Ap. 82(a).

[72] *Véase* Ley Núm. 38 de 13 de junio de 1978, 3 L.P.R.A. secs. 138 *et seq.*, particularmente las secciones 138c y 138f; Plan de Reorganización del Departamento de Justicia de 2011, 3 L.P.R.A. Ap. XXI, Aps. 68-69.

llamadas hechas por los oficiales del NIE que participaron en el operativo desde sus teléfonos <u>oficiales</u>. Por tanto, en cuanto a ellos, no hacía falta obtener una orden judicial previa o notificar a los agentes.

Al examinar las listas, la agencia encontró un número de teléfono ajeno a los suyos e identificó que uno de los inspectores había hecho tres llamadas a ese número, tres horas antes del operativo y mientras este se llevaba a cabo. Acto seguido, solicitó a Cingular, mediante otra orden *subpoena*, que produjera el <u>nombre e información personal del usuario de ese número</u>, así como <u>una relación de todas las llamadas realizadas y recibidas por este en el mes de febrero</u>. No se notificó de ello al señor Weber, usuario del teléfono. Según explicamos, una persona tiene una expectativa razonable de intimidad sobre el registro de llamadas de su teléfono, por lo cual el NIE debió haberle notificado al demandante sobre el registro u obtener una orden judicial que le autorizara a requerir dicha información.

Ahora bien, el incumplimiento de la agencia con esta obligación legal no resuelve del todo la controversia ante nuestra consideración. Recordemos que el efecto principal de concluir que hay una expectativa razonable de intimidad sobre alguna información solicitada por el Estado es imponerle a los tribunales la obligación de analizar la razonabilidad del requerimiento a la luz de los tres

criterios previamente expuestos. Así, deberán examinar si la investigación estaba dentro de la autoridad conferida por ley a la agencia, si el requerimiento no era demasiado indefinido y si la información solicitada era razonablemente pertinente al asunto específico bajo investigación. En este caso particular, no podemos perder de perspectiva que la solicitud no es un requerimiento meramente administrativo, pues la agencia estaba investigando la comisión de un delito. Por tanto, si bien no se requiere un estándar de causa probable como comúnmente se utiliza en el contexto penal, debemos requerir el cumplimiento estricto y riguroso de los requisitos aplicables a los requerimientos administrativos.

El objeto de la investigación del NIE en este caso no era el señor Weber. El Estado ha sido enfático en ese sentido y ha alegado consistentemente que una vez descubrió la identidad del señor Weber, cesó toda investigación en cuanto a él. El señor Weber era, pues, un tercero en cuanto a la investigación se refiere y el tenedor de la información solicitada, Cingular, también lo era. Hemos visto que las protecciones constitucionales son más fuertes cuando el Estado requiere información a un tercero sobre una persona o entidad que, a su vez, es un tercero en cuanto a la investigación que está llevando a cabo la agencia.

En vista de lo anterior, ¿era razonable que se le requiriera a la compañía telefónica que informara el nombre del usuario del celular? ¿Era razonable el requerimiento en cuanto al registro de las llamadas que se hicieron durante todo el mes de febrero desde dicho celular? En cuanto a la solicitud del nombre del usuario, entendemos que la situación es similar a la de los cheques del Departamento de Hacienda en *Pueblo v. Loubriel, Suazo*. Es decir, el Estado tenía derecho a investigar la identidad de la persona a quien uno de sus agentes llamó desde su teléfono oficial poco antes y durante el operativo. Se trata, pues, de un requerimiento enteramente razonable.

No podemos decir lo mismo en cuanto al requerimiento de entrega de la factura y con ello, del historial de llamadas del celular. Si bien el NIE tiene amplias facultades investigativas y el requerimiento a Cingular no era demasiado indefinido, las facturas del uso dado al teléfono por el señor Weber durante todo el mes de febrero no son razonablemente pertinentes al asunto específico bajo investigación. A la luz de lo anterior, al no notificarle u obtener una orden judicial para tal requerimiento, y al no ser razonable el mismo, se violó la intimidad del señor Weber.

Las sentencias del Tribunal de Primera Instancia y del Tribunal de Apelaciones llegaron a conclusiones distintas a las que hoy elaboramos. Ambos tribunales reconocieron que

el Tribunal Supremo no se ha pronunciado sobre el derecho a la intimidad en el ámbito de los registros de llamadas telefónicas en manos de terceros, sin embargo, concluyeron categóricamente que el señor Weber no tenía una expectativa de intimidad sobre el registro de llamadas de su teléfono porque su patrono era quien recibía y pagaba la factura del teléfono. De esa forma, al evaluar la prueba presentada por el señor Weber, los foros inferiores partieron de la premisa de que los reclamos de este sobre violación a su derecho a la intimidad no tenían base en nuestro ordenamiento. Nos preocupa el efecto de esta conclusión sobre la evaluación que venían llamados a hacer ambos tribunales respecto a la prueba presentada por el señor Weber sobre las angustias mentales sufridas por él a raíz de los acontecimientos de este caso.[73]

En ocasiones anteriores hemos resuelto que cuando un ciudadano presenta una reclamación alegando que el Estado le ha violado algún derecho constitucional, los tribunales estamos obligados a proveer los remedios que vindiquen efectivamente el agravio sufrido y aminoren el daño

---

[73] El expediente del caso no está desprovisto de evidencia sobre daños. Por ejemplo, en su determinación de hecho número 34 el propio Tribunal de Primera Instancia menciona que la impresión diagnóstica del doctor Víctor Lladó fue de una puntuación de GAF 60 (GAF - Global Assesment of Functioning), entre la frontera de una condición leve y moderada. Apéndice del *certiorari*, Sentencia del Tribunal de Primera Instancia, pág. 560. Véase, además, el Informe Psiquiátrico Pericial y el testimonio del Dr. Lladó. *Íd.*, págs. 872-877 y 139-165.

provocado por el Estado.[74] Al resolver que el señor Weber albergaba una expectativa razonable de intimidad sobre el registro de llamadas de su teléfono móvil y que el Estado actuó de manera irrazonable, se configura el elemento de culpa o negligencia exigido por el artículo 1802. Resta evaluar entonces la prueba de daños y causalidad presentada por el señor Weber a la luz de la violación de su derecho a la intimidad.

En virtud de lo anterior, revocamos la sentencia dictada por el Tribunal de Apelaciones. Procede entonces que devolvamos este caso al foro primario para que evalúe la prueba presentada por el señor Weber sobre los daños sufridos a la luz de lo aquí resuelto sobre la violación de su derecho a la intimidad.

Se dictará Sentencia de conformidad.

Liana Fiol Matta
Jueza Asociada

---

[74] Rodríguez Cruz v. Padilla Ayala, 125 D.P.R. 486 (1990); Noriega v. Gobernador, 122 D.P.R. 650 (1988).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Carlos Weber Carrillo
      Peticionario

                                        *Certiorari*

         v.
                              CC-2010-588

Estado Libre Asociado de Puerto
Rico y otros
         Recurridos




SENTENCIA


En San Juan, Puerto Rico, a 24 de marzo de 2014.


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, revocamos la sentencia dictada por el Tribunal de Apelaciones. Se devuelve el caso al foro de instancia para que evalúe la prueba presentada por el señor Weber sobre los daños sufridos a la luz de lo aquí resuelto sobre la violación de su derecho a la intimidad.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió una Opinión disidente a la cual se unen la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Kolthoff Caraballo. La Juez Asociada señora Rodríguez Rodríguez y el Juez Asociado señor Rivera García no intervienen.



Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Weber Carrillo

     Peticionario

        v.

                        CC-2010-588

Estado Libre Asociado de Puerto Rico

     Recurrido

Opinión disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES a la cual se unieron la Jueza Asociada señora PABÓN CHARNECO y el Juez Asociado señor KOLTHOFF CARABALLO.

En San Juan, Puerto Rico, a 24 de marzo de 2014.

En ocasiones surgen temas interesantes en nuestro quehacer judicial que nos seducen y nos llevan a realizar expresiones innecesarias para resolver un caso. La Opinión que emite hoy este Tribunal es un ejemplo de ello. En este caso, el Tribunal de Primera Instancia y el Tribunal de Apelaciones coinciden en que el peticionario Sr. Carlos Weber Carrillo **no probó que sufrió daños** como consecuencia de la presunta acción inconstitucional del Estado. Luego de analizar con mucho detenimiento el expediente de este caso y los alegatos de las partes, comparto el criterio de esos foros.

En atención a la norma trillada que establece que en ausencia de pasión, prejuicio, error manifiesto o parcialidad los foros apelativos no deben intervenir con las determinaciones de hechos y la apreciación de la prueba que realiza el foro primario, disiento con mucho respeto del criterio de mis compañeros. Dávila Nieves v. Meléndez Marín, Op. de 6 de febrero de 2013, 2013 T.S.P.R. 12, 2013 J.T.S. 15, 187 D.P.R. __ (2013); Pueblo v. Millán Pacheco, 182 D.P.R. 595, 642 (2011); Colón v. Lotería, 167 D.P.R. 625, 659 (2006); Lugo v. Municipio Guayama, 163 D.P.R. 208, 221 (2004); Argüello v. Argüello, 155 D.P.R. 62, 78-79 (2001).

La adjudicación correcta de este caso requiere que confirmemos el dictamen del Tribunal de Apelaciones que desestimó **la demanda de daños** que presentó el señor Weber Carrillo. Para llegar a ese resultado es innecesario embarcarse en el análisis de derecho de intimidad que contiene la Opinión del Tribunal. Es decir, todo el análisis que elabora la Opinión del Tribunal en cuanto al derecho de intimidad es *dictum*, ya que es inconsecuente ante el hecho de que **no se probaron daños en una acción de esa naturaleza**. Ortiz Chévere et al. v. Srio. Hacienda, 186 D.P.R. 951, 980 (2012); Ortiz v. Panel F.E.I., 155 D.P.R. 219, 252 (2001).

## I

La controversia de autos surgió mientras el Negociado de Investigaciones Especiales (NIE) realizaba una

investigación criminal que concluyó el 12 de febrero de 2003, con un allanamiento y el subsiguiente arresto de varios individuos residentes de Bayamón, en un negocio identificado como "El Mundo de los DVD". Luego de realizados varios arrestos en el Municipio de Bayamón, mientras se llevaba a cabo el diligenciamiento de la orden de allanamiento, una unidad de la cadena de televisión Univisión y el señor Weber Carrillo acudieron a las facilidades del NIE a indagar sobre el operativo que se realizaba. El fiscal Miguel Colón Ortiz, Director del NIE para esa fecha, se sorprendió con la llegada de la prensa en un lapso tan corto luego de iniciado el operativo.

La presencia de ese reportero generó preocupación en el fiscal Colón Ortiz, pues pensó que alguien divulgó a la prensa con anticipación el operativo que se realizaba ese día. Ningún funcionario del NIE estaba autorizado a divulgar a los medios noticiosos el diligenciamiento de una orden de allanamiento o arresto sin la debida autorización del Director del NIE, de la Secretaria de Justicia, o la Oficina de Prensa del Departamento de Justicia.

El NIE decidió realizar una investigación ante la posibilidad de que un miembro suyo generara una llamada sin autorización a los medios noticiosos. Al requerir información a la compañía Cingular mediante el uso de *subpoena*, surgió un número de teléfono como el posible facilitador de la información confidencial divulgada. Una

vez obtenida esta información, el fiscal conoció que desde el número de teléfono asignado al inspector Jorge Gorritz se originaron tres llamadas a un número telefónico que resultó ser ajeno a los números de teléfono de los demás miembros del NIE que participaron en el operativo. Esas tres llamadas fueron realizadas tres horas antes del operativo y mientras este transcurría.

Ante ese hallazgo, el Fiscal Francisco Viera Tirado autorizó una citación subpoena duces tecum dirigida a la compañía Cingular, para que informara (1) a quién pertenecía el número en controversia y (2) proveyera la relación de llamadas correspondientes al mes de febrero de 2003. Así surgió que el referido número pertenecía al señor Weber Carrillo.

La divulgación por un agente del NIE a un tercero de información relacionada al funcionamiento, operación o actividades de dicha agencia constituye un delito grave que atenta contra la integridad de los agentes involucrados. Art. 82(a) del Plan de Reorganización Núm. 4-2011, 3 L.P.R.A. Ap. XXI. Por tal razón, el Fiscal Colón Ortiz, como Director del NIE, ordenó al Fiscal Viera Tirado investigar y, de encontrarse evidencia, encausar criminalmente al agente del NIE que divulgó pormenores del operativo en violación de la ley.

Al NIE no le interesaba investigar a quién se le había filtrado la información, sino qué agente había violado la

ley y era responsable de la filtración. El Director del NIE recibió en su oficina al Lcdo. Antonio Figueroa, abogado del señor Weber Carrillo, y habló por teléfono con este último para confirmar que no había ninguna investigación en su contra y que las investigaciones que aún continuaban tenían el fin de detectar filtraciones de información confidencial. De los autos no surge que el NIE interviniera con conversaciones telefónicas o conociera el contenido de conversaciones telefónicas iniciadas desde el teléfono del señor Weber Carrillo.

El 29 de septiembre de 2004, el periodista Carlos Weber Carrillo presentó **una demanda sobre daños y perjuicios** contra el Estado y los fiscales Viera Tirado y Colón Ortiz, entre otros.[75] Sostuvo que su patrono, el canal de televisión Univisión, le proveyó un teléfono celular de la compañía Cingular como parte de su trabajo y que el 22 de octubre de 2003, advino en conocimiento de que el Fiscal Viera Tirado había solicitado a la compañía de celulares que le remitiera copia de los estados mensuales de sus

---

[75] El 7 de junio de 2006, el Tribunal de Primera Instancia dictó una sentencia parcial desestimando la demanda en cuanto a Univisión y Cingular. El 2 de diciembre de 2006, el mismo tribunal dictó otra sentencia parcial desestimando con perjuicio en cuanto al entonces Fiscal General, Lcdo. Pedro Gerónimo Goyco y en cuanto al ex Secretario de Justicia, Lcdo. William Vázquez Irizarry. Posteriormente, el Tribunal de Primera Instancia declaró no ha lugar la moción de sentencia sumaria presentada por el Estado. El Estado presentó una solicitud de *certiorari* ante el Tribunal de Apelaciones. El foro apelativo intermedio modificó la resolución recurrida, a los efectos de desestimar la demanda contra los fiscales Francisco Viera Tirado y Miguel Colón Ortiz, al amparo de la doctrina de inmunidad condicionada. El señor Weber Carrillo acudió ante este Tribunal mediante una petición de *certiorari,* que fue denegada mediante Resolución de 21 de diciembre de 2007.

llamadas telefónicas, las cuales fueron entregadas. Alegó que los codemandados violaron su derecho a la intimidad al intervenir con su teléfono celular sin aviso ni orden judicial. En su consecuencia, solicitó una **indemnización** por unas alegadas angustias mentales sufridas, que estimó en $650,000.

El 15 de junio de 2009, el Tribunal de Primera Instancia declaró no ha lugar la demanda y ordenó su archivo y sobreseimiento. Concluyó, en síntesis, "que de la prueba desfilada no surge que el teléfono del Sr. Weber haya sido intervenido". Determinó, además, que la acción del Fiscal Viera Tirado estaba amparada en la Ley orgánica del NIE, la cual reconoce la facultad del fiscal para emitir subpoenas "como parte de una investigación en las relaciones de llamadas de los funcionarios del NIE". Apéndice, pág. 572. En cuanto a las alegaciones de violación a la expectativa de intimidad y daños y perjuicios, el Tribunal de Primera Instancia determinó:

> [q]ue en este caso no se probó que en efecto al demandante se le haya violado su derecho a una expectativa de privacidad e intimidad respecto a su teléfono celular, además de que **no se probó, ni se presentó prueba convincente sobre algún daño real y palpable sufrido por el demandante.** Si algún daño ha experimentado el Sr. Weber, no se logró establecer un nexo causal entre dicho daño y las actuaciones realizadas por el Estado y los funcionarios del Negociado de Investigaciones Especiales (NIE). Apéndice, pág. 571. (Énfasis suplido.)

Inconforme, el señor Weber Carrillo presentó un recurso de apelación ante el Tribunal de Apelaciones, en el

cual hizo cinco señalamientos de error. Luego de los trámites de rigor, el Tribunal de Apelaciones emitió una sentencia en la que confirmó el dictamen del Tribunal de Primera Instancia.

Aún en desacuerdo, el señor Weber Carrillo acude ante este Foro mediante petición de certiorari. Expresa que el Tribunal de Apelaciones erró al determinar que no existe una expectativa razonable de intimidad sobre la información o documentos relacionados a los patrones de uso de su teléfono celular. También sostiene que el Tribunal de Apelaciones se equivocó al determinar que no sufrió daños resarcibles.

En el día de hoy, la Opinión del Tribunal resuelve que el Estado violó la intimidad del señor Weber Carrillo. Además, devuelve el caso al foro primario para que se evalúe **nuevamente** "la prueba de daños y causalidad presentada por el señor Weber a la luz de su derecho a la intimidad". Opinión del Tribunal, pág. 35.

**II**

**A.** Hemos establecido que para que proceda una reclamación por daños y perjuicios conforme al Art. 1802 del Cód. Civil, 31 L.P.R.A. sec. 4151, es necesario que haya un acto u omisión culposa o negligente, una relación causal entre el acto o la omisión culposa o negligente, y un daño causado. Véanse Nieves Díaz v. González Massas, 178 D.P.R 820, 843 (2010); López v. Porrata Doria, 169 D.P.R. 135,

150 (2006); Pons v. Engebretson, 160 D.P.R. 347, 354 (2003).

Asimismo, hemos expresado que constituye "un daño el menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, en su propiedad o en su patrimonio, causado en contravención de una norma jurídica y por el cual ha de responder otra persona". Nieves Díaz v. González Massas, supra, pág. 845. Véanse, además, Ramírez Ferrer v. Conagra Foods PR, 175 D.P.R. 799, 817 (2009); Cintrón Adorno v. Gómez, 147 D.P.R. 576, 583 (1999); Galib Frangie v. El Vocero de P.R., 138 D.P.R. 560, 571 (1995); García Pagán v. Shiley Caribbean, etc., 122 D.P.R. 193, 205-206 (1988).

Sin embargo, no basta la mera existencia de un daño y una acción u omisión negligente. También es necesario que exista un nexo causal entre el daño y el acto culposo o negligente. En nuestra jurisdicción rige la doctrina de la causalidad adecuada, según la cual "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". Nieves Díaz v. González Massas, supra, pág. 844; López v. Porrata Doria, supra, págs. 151-152.

Nuestro ordenamiento jurídico reconoce dos tipos de daños: los daños especiales, también conocidos como daños físicos, económicos o patrimoniales, que recaen sobre bienes objetivos y que, por impactar directamente el

patrimonio del perjudicado, son susceptibles de valoración económica; y los daños morales, que son aquellos que recaen sobre los sentimientos, la dignidad o estima social del perjudicado. Cintrón Adorno v. Gómez, supra, pág. 587. El daño moral, aunque de naturaleza extrapatrimonial por lesionar bienes no económicos de la persona, puede traer repercusiones sobre el patrimonio del perjudicado. Íd. El daño sufrido tiene que ser real, lo que a su vez requiere la concurrencia de tres elementos esenciales: 1) el daño ha de causar una lesión, pérdida o menoscabo; 2) el daño ha de recaer sobre bienes o intereses jurídicos de una persona; y 3) el daño ha de ser resarcible de alguna forma. Soto Cabral v. E.L.A., 138 D.P.R. 298, 312 (1995). Véase, en general, J. Santos Briz, La Responsabilidad Civil, 6ta ed., Madrid, Ed. Montecorvo, 1991.

Por su parte, es norma conocida que el Estado responde por los daños ocasionados por los actos negligentes de sus funcionarios, conforme a la doctrina de responsabilidad civil extracontractual del Art. 1802 del Cód. Civil, supra. Art. 1803 del Cód. Civil, 31 L.P.R.A. sec. 5142; Defendini Collazo, et al. v. E.L.A, Cotto, 134 D.P.R. 28, 48-49 (1993); García v. E.L.A., 146 D.P.R. 725, 734 (1998); H. Brau del Toro, Los Daños y Perjuicios Extracontractuales en Puerto Rico, 2da Ed., Publicaciones J.T.S., 1986, Vol. II, pág. 794. En particular, la Ley de Reclamaciones y Demandas contra el Estado, Ley Núm. 104 de 29 de junio de 1955,

según enmendada, 32 L.P.R.A. sec. 3077 et seq., autoriza demandar al Estado en ciertas y determinadas circunstancias. El Art. 2 de la Ley Núm. 104, íd., 32 L.P.R.A. sec. 3077, permite acciones en daños y perjuicios a la persona o a la propiedad cuando sean "causados por acción u omisión de cualquier funcionario, agente o empleado del E.L.A., o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo culpa o negligencia".

Así pues, para que un demandante pueda prevalecer en una acción por daños y perjuicios contra el Estado, por las actuaciones u omisiones culposas o negligentes de un funcionario, tiene que establecer: (1) que la persona que le causó daño era agente, funcionario o empleado del E.L.A. y que actuaba en su capacidad oficial al momento de causar el daño; (2) que el agente, funcionario o empleado actuó dentro del marco de su función; (3) que la actuación del empleado del [E.L.A.] fue negligente y no intencional y ;(4) que existe una relación causal entre la conducta culposa y el daño producido. García Gómez v. E.L.A., 163 D.P.R. 800, 811-812 (2005), Leyva et al. v. Aristud et al., 132 D.P.R. 489, 510 (1993).

**B.** En nuestro ordenamiento jurídico, la discreción judicial permea la evaluación de la evidencia presentada en los casos y controversias. Hernández Maldonado v. The Taco Maker, Inc., 181 D.P.R. 281, 289 (2011); Miranda Cruz y

otros v. S.L.G. Ritch, 176 D.P.R. 951, 974 (2009); Trinidad v. Chade, 153 D.P.R. 280, 291 (2001). Como regla general, un tribunal apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos, ni tiene facultad de sustituir las determinaciones del foro primario por sus propias apreciaciones. Dávila Nieves v. Meléndez Marín, 187 D.P.R. 750, 771 (2013); S.L.G. Rivera Carrillo v. A.A.A., 177 D.P.R. 345, 356 (2009); Rolón v. Charlie Car Rental, 148 D.P.R. 420, 433 (1999).

El fundamento de esa deferencia hacia el Tribunal de Primera Instancia radica en que el juez de ese foro tuvo la oportunidad de observar toda la prueba presentada y, por lo tanto, se encuentra en mejor posición que el tribunal apelativo para considerarla. Dávila Nieves v. Meléndez Marín, supra, pág. 771; Sepúlveda v. Departamento de Salud, 145 D.P.R. 560, 573 (1998). Por esa razón se ha reiterado la norma fundamental de nuestro ordenamiento jurídico de que los tribunales apelativos, en ausencia de error, pasión, prejuicio o parcialidad, no deben intervenir con las determinaciones de hecho, la apreciación de la prueba y las adjudicaciones de credibilidad realizadas por los tribunales de instancia. Dávila Nieves v. Meléndez Marín, íd.; Suárez Cáceres v. C.E.E., 176 D.P.R. 31, 67-68 (2009); Argüello v. Argüello, 155 D.P.R. 62, 78-79 (2001).

Por razón de ese principio básico de nuestro derecho, la Regla 42.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V, establece que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se le dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos".

**III**

La Opinión del Tribunal expone en su pág. 8, esc. 10, que no va a atender el planteamiento del Estado de que <u>no se probaron daños</u> porque va a referir ese asunto al Tribunal de Primera Instancia. A esos efectos, la Opinión del Tribunal, pág. 35, expresa que la razón para devolver el caso al foro primario es la preocupación que tiene por la forma en que los tribunales de categoría inferior evaluaron la prueba, pues partían de la premisa de que el señor Weber Carrillo no tenía expectativa de intimidad sobre el registro de llamadas de su teléfono celular. Sin embargo, en la Pág. 35, esc. 73, la Opinión de la Mayoría se sumerge en un análisis de la prueba para concluir que el "expediente no está desprovisto de evidencia de daños". A diferencia de la Opinión del Tribunal, opino que la adjudicación sobre los daños que realizó el Tribunal de Primera Instancia está respaldada por la prueba que desfiló, o para ser más preciso, por la que **no** se presentó.

En su alegato ante esta Curia, el señor Weber Carrillo impugnó la revisión que hizo el Tribunal de Apelaciones sobre el ejercicio de apreciación de la prueba oral del foro primario. También señaló que el Tribunal de Apelaciones debió concederle una indemnización en daños y perjuicios. Luego de analizar con detenimiento el expediente, es menester concluir que las determinaciones de hechos están sostenidas por la prueba que se presentó.

En este caso, el señor Weber Carrillo no probó los supuestos daños sufridos. De hecho, se desprende de la transcripción del juicio que el demandante **no pudo establecer la naturaleza y el alcance de los daños alegados.** De la Transcripción del Juicio, Vol. II, págs. 123-124, surge lo siguiente:

> P. Don Carlos, le pregunto, como consecuencia de los hechos del presente caso, ¿qué angustias y sufrimientos mentales usted ha sufrido?
>
> TESTIGO—CARLOS WEBER CARRILLO
>
> R. **Eso es medio difícil de explicar, primero porque a mí no me gusta descubrir mis sentimientos. Pero creo que hay una... digo, entiendo, que es irracional lo que ha sucedido conmigo, porque esto se podría haber solucionado, supongo yo, que con una llamada por teléfono a mí.** (Énfasis suplido).

Además de su testimonio, el señor Weber Carrillo presentó al perito psiquiatra Dr. Víctor Lladó Díaz para intentar probar los alegados daños que sufrió. La evaluación psiquiátrica se realizó mediante exámenes y entrevistas al señor Weber Carrillo. <u>Sentencia del Tribunal</u>

de Primera Instancia, pág. 7, Apéndice, pág. 560. Surge de los autos que el doctor Lladó Díaz no brindó tratamiento psiquiátrico al señor Weber Carrillo. Íd. La impresión diagnóstica que hizo el doctor Lladó Díaz del señor Weber Carrillo fue una puntuación de sesenta en el *Global Assesment of Functioning*, colocándolo entre la frontera de una condición leve y moderada. Íd. También es un hecho probado que el señor Weber Carrillo desarrolló cierta sintomatología postraumática no por el incidente que motivó este caso sino debido al pasado difícil que vivió por la situación política en Chile, tras ser perseguido políticamente por parte del régimen de Augusto Pinochet. Íd. El señor Weber Carrillo no ha recibido tratamiento psiquiátrico por la persecución política que vivió en Chile. Sentencia del Tribunal de Primera Instancia, pág. 8, Apéndice, pág. 561. Por último, se desprende de las determinaciones de hechos que emitió el foro primario que las defensas psicológicas del señor Weber Carrillo son muy eficientes y fortalecidas. Íd.

A base de la prueba que presentó el señor Weber Carrillo, el foro primario concluyó que no se evidenciaron los daños alegados. Sentencia del Tribunal de Primera Instancia, pág. 17, Apéndice, pág. 570. En particular, expresó lo siguiente: "el testimonio del demandante y su perito psiquiatra, no demostr[aron] que el demandante tuviera angustias mentales relacionadas con los hechos que

surgen en la demanda. Los daños se centraron en episodios vividos años atrás en su país natal Chile". Sentencia del Tribunal de Primera Instancia, pág. 20, Apéndice, pág. 573.

El Tribunal de Apelaciones tomó constancia de las determinaciones de hechos que emitió el foro primario y las confirmó, ya que no se demostró pasión, prejuicio, error manifiesto o parcialidad en la apreciación de la prueba. Véase, Sentencia del Tribunal de Apelaciones, pág. 19, esc. 5.

Conforme la Regla 110 de Evidencia, 32 L.P.R.A. Ap. VI, el "peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes". En este caso, el señor Weber Carrillo tenía el peso de probar las angustias mentales que le causaron las alegadas actuaciones inconstitucionales del Estado. No obstante, durante el juicio el señor Weber Carrillo rehusó declarar sobre esas angustias mentales porque era una persona que no le gusta hablar acerca de sus sentimientos. Ningún otro testigo pudo descubrirlos tampoco. Ante ese escenario, considero que los foros recurridos no erraron al concluir que el señor Weber Carrillo no probó los alegados daños que dieron origen al caso que nos ocupa. Nieves Díaz v. González Massas, supra, pág. 845; Ramírez Ferrer v. Conagra Foods PR, supra, pág. 817; Soto Cabral v. E.L.A., supra, pág. 312.

Adviértase que lo que demostró la prueba pericial en este caso fue que el señor Weber Carrillo todavía conserva angustias por el pasado desafortunado que vivió en Chile. No obstante, la prueba no demostró que esas angustias estuvieran atadas a las alegadas actuaciones inconstitucionales del Estado. Es decir, no existe nexo causal entre ellas. Nieves Díaz v. González Massas, supra, pág. 844; López v. Porrata Doria, supra, págs. 151-152.

Ante la realidad ineludible de que el señor Weber Carrillo no probó los elementos de la causa de acción que presentó, no tiene sentido ni lógica alguna devolver este caso al foro primario para que se evalúe otra vez "la prueba de daños y causalidad presentada por el señor Weber a la luz de su derecho a la intimidad". Opinión del Tribunal, pág. 35. De forma implícita, la Opinión del Tribunal le otorga una segunda oportunidad al señor Weber Carrillo para que intente convencer al Tribunal de Primera Instancia de los alegados daños sufridos. Además, el Tribunal intenta influenciar la discreción del foro primario porque sugiere que el "expediente no está desprovisto de evidencia de daños". Opinión del Tribunal, pág. 35, esc. 73. Esa actuación lacera los principios más elementales de nuestro sistema adversativo. El señor Weber Carrillo tuvo la oportunidad de probar su caso ante el foro primario y no lo logró. La adjudicación correcta de este

caso requiere que confirmemos los dictámenes recurridos que desestimaron la demanda.

Ante esa realidad, es innecesario entrar a discutir el planteamiento de violación del derecho de intimidad que esgrime el señor Weber Carrillo en su alegato. Aun si concluyéramos que hubo una violación del derecho de intimidad, comoquiera tendríamos que desestimar la demanda que nos ocupa ante la ausencia de daños probados. Cualquier determinación nuestra en otra dirección serían "meras expresiones judiciales excesivas e innecesarias". Ortiz Chévere et al. v. Srio. Hacienda, supra, pág. 980, citando a Ortiz v. Panel F.E.I., supra, pág. 253.

Por último, en vez de fundamentar su dictamen como una protección de la confidencialidad de las fuentes de un periodista, al amparo del Art. II, Sec. 4 de la Constitución de Puerto Rico, L.P.R.A. Tomo I, el Tribunal se basa en el derecho más amplio a la intimidad. Const. P.R., Art. II, Sec. 8, L.P.R.A. Tomo I. De ese modo, y sin mayor estudio o análisis, el Tribunal ha creado un requisito de que se notifique a cualquier persona, incluyendo aquella sospechosa o investigada por la posible comisión de un delito, que el Fiscal ha solicitado su registro de llamadas. Con eso se anula esa herramienta de investigación para todo efecto práctico. En fin, actuando en total abstracción de la realidad cotidiana del Puerto Rico de hoy, el Tribunal ha convertido "la factura más

ancha en la factura más costosa jamás pagada por el Pueblo de Puerto Rico". RDT Const. Corp. v. Contralor I, 141 D.P.R. 424, 469 (1996) (Opinión concurrente del Juez Asociado señor NEGRÓN GARCÍA).

**IV**

Por los fundamentos antes expuestos, disiento respetuosamente del curso seguido por este Tribunal. Procede confirmar los dictámenes recurridos y desestimar la demanda de autos. Es improcedente devolver este caso al foro primario para conceder una segunda oportunidad de evaluar la prueba de unos daños inexistentes.

RAFAEL L. MARTÍNEZ TORRES
Juez Asociado